UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------X
MAUREEN ANNE KELLY,

                Plaintiff,            <u>MEMORANDUM & ORDER</u>
                                           20-CV-5318 (JS)

   -against-

COMMISSIONER OF SOCIAL SECURITY,[1]

                Defendant.
--------------------------------X
APPEARANCES

For Plaintiff:       John L Patitucci
                      Turley, Redmond, & Rosasco
                      3075 Veterans Memorial Highway, Suite 200
                      Ronkonkoma, New York  11779


For Defendant:       John P. Fox, Esq., Special A.U.S.A.
                      United States Attorney's Office
                      Eastern District of New York
                      c/o SSA, Office of Program Litigation
                      6401 Security Boulevard
                      Baltimore, Maryland  21235


**SEYBERT, District Judge:**

       Plaintiff Maureen Anne Kelly ("Plaintiff") brings this action pursuant to Section 205(g) of the Social Security Act (the "Act"), 42 U.S.C. § 405(g), challenging the denial of her application for Social Security Disability Benefits by the

---

[1] At the time Plaintiff commenced this action, the Commissioner of Social Security was Andrew Saul. The current Commissioner is Martin O'Malley. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, the Clerk of Court is directed to substitute Martin O'Malley for Andrew Saul. For convenience, the Court will simply refer to the Defendant as "Commissioner".

Commissioner of Social Security (the "Commissioner"). (Compl., ECF No. 1.)  Pending before the Court are the parties' cross-motions for judgment on the pleadings.  (Pl. Mot., ECF No. 11; Pl. Support Memo, ECF No. 11-1; Comm'r X-Mot., ECF No. 13; Comm'r Support Memo, ECF No. 13-1; Pl. Reply, ECF No. 14; <u>see also</u> Admin. Tr., ECF No. 10.[2].)  For the following reasons, Plaintiff's Motion is GRANTED, and the Commissioner's Cross-Motion is DENIED.

**BACKGROUND**

I.   <u>Procedural History</u>

On March 16, 2018, Plaintiff applied for disability insurance and supplemental security income benefits alleging disability as of December 22, 2017 (hereafter, the "Onset Date"), due to complications with multiple sclerosis and congestive heart failure.  (R. 108-18; 133-37).  Her application was denied on September 19, 2018. (R. 139-53). On September 28, 2018, Plaintiff appealed the denial of her application and requested a hearing before an Administrative Law Judge ("ALJ"). (R. 155-57).

Accompanied by counsel, on January 31, 2020, Plaintiff appeared before ALJ Alan Berkowitz for a disability hearing (hereafter, the "Disability Hearing"). (R. 78).  Plaintiff and Ms. Holland, a vocational expert ("VE"), both testified at said Hearing (R. 78-106).  On March 30, 2020, the ALJ Alan Berkowitz issued an

---

[2]  Hereafter, the Court shall cite to the Administrative Transcript as "R" and provide the relevant Bates Stamp number(s).

unfavorable decision, determining Plaintiff had the residual functional capacity ("RFC") to perform light work with various non-exertional limitations (hereafter, the "ALJ Decision") (R. 15-29).

Plaintiff appealed the ALJ Decision (R. 207-09); she was granted time to submit further "statements about the facts and the law in this case" or any "additional evidence". (R. 12-13). Additional evidence was required to show a "reasonable probability" it "would change the outcome of the decision" and Plaintiff was required to show good cause for why such evidence was not been submitted previously. (Id.) Plaintiff submitted additional medical evidence from her neurologist, Dr. Brian Apatoff. (R. 34-52). Finding the medical evidence from Dr. Apatoff "did not show a reasonable probability that it would change the outcome of the decision", on October 1, 2020, the Appeals Officer denied Plaintiff's request for review, making the ALJ Decision the final decision of the Commissioner. (R. 1-3). Thereafter, Plaintiff sought judicial review.

Plaintiff commenced this action on November 3, 2020. (See Compl.) On July 27, 2021, Plaintiff moved for judgment on the pleadings. On October 15, 2021, the Commissioner cross-moved. On September 24, 2021, Plaintiff filed her reply. The Cross-Motions are ripe for decision.

## II.  Evidence Presented to the ALJ

The Court first summarizes Plaintiff's testimonial evidence and employment history before turning to her medical records and the VE's testimony.

### A.  Testimonial Evidence and Employment History

At the time of the Disability Hearing, Plaintiff was 59 years old. (R. 81).  Plaintiff finished high school when she was 16-years-old and college when she was 20-years-old. (R. 85) Plaintiff experienced her first multiple sclerosis exacerbation during college (R. 85). In her 20's, Plaintiff: had various medical complications; was diagnosed with Graves' disease and carpal tunnel; and, received intravenous ("IV") infusions of steroids. (R. 85). Plaintiff was 38-years-old when she was formally diagnosed with multiple sclerosis. (R. 84). For at least 20 years, Plaintiff has experienced lingering pain in her right leg, which she described as feeling "on fire" and as a "pins and needles" sensation. (R. 86, 93).  Plaintiff additionally described experiencing blurred vision and a stabbing pain in her left eye. (R. 86).

In 2013, Plaintiff suffered a massive heart attack as a result of a 100 percent blocked valve. (R. 90.)  Thereafter, she received a stent, pacemaker, and internal defibrillator.  (R. 90-91.)  Plaintiff testified she suffers from extreme fatigue, which can impede her ability to drive, e.g., causing her to have

to pull over up to two times when driving to work. (R. 91.) She also stated she experiences blurred vision, which was problematic in dealing with computers, and experiences cognitive problems. (R. 92.)

From 1997 through 2003, Plaintiff worked as vice president of financial operations for Lenox Hill Hospital. (R. 263). In that role, she negotiated contracts on behalf of hospitals, doctors, and insurance companies. (R. 264). Although diagnosed with multiple sclerosis in 1988, Plaintiff did not disclose her illness for most of her tenure because she was able to perform all job functions effectively, only experiencing limited flare ups. (R. 268). Then, from 2004 to 2011, Plaintiff worked as an associate executive director at Providence House, a social service agency. (R. 265). Plaintiff was responsible for all business-related functions. (Id.). Plaintiff fully disclosed her health issues prior to being hired; further, this position allowed for one day off per work week and was relatively less stressful. (R. 268). Next, from 2012 to 2017, Plaintiff worked as a chief operating officer at a school for disabled children. (R. 266). In that position, Plaintiff oversaw accounting, purchasing, technology, and business-related functions. (Id.) Plaintiff was afforded the opportunity to frequently work from home, which was significant on hot days when Plaintiff's multiple sclerosis symptoms were exacerbated. (R. 268).

Plaintiff further reported her ability to process information and produce reports had steadily declined. (R. 268). Blurred vision issues, chronic exhaustion, and gait issues were daily challenges the Plaintiff endured. (R. 268). Plaintiff detailed having trouble sitting still due to the pain in her leg. (R. 93). Plaintiff also had: high blood pressure; acid reflux; coronary artery disease status post-converted defibrillator; high cholesterol; depression (R. 93); difficulty concentrating; and, experienced short-term memory loss (R. 97). Further, Plaintiff often needed to sleep at her place of employment due to overwhelming fatigue (R. 97). She testified she could walk only three blocks before being overcome by fatigue and needing a break. (R. 99.)

B. <u>Medical Evidence</u>

1. <u>Brian Richard Apatoff, M.D.</u>

On April 30, 2018, Dr. Brian Apatoff, M.D. ("Dr. Apatoff"), Plaintiff's treating neurologist, wrote a statement of disability (hereafter, the "2018 Apatoff Statement"), which included the following information. (R. 428). Plaintiff was diagnosed with multiple sclerosis in 1988 by abnormal brain and spinal MRIs, following optic neuritis with loss of vision in her left eye; she suffered leg numbness and weakness. (<u>Id.</u>) In addition, Plaintiff had hypertension, myocardial infarction, and cardiac arrhythmia with a permanent pacemaker placement. (<u>Id.</u>)

Plaintiff was on interferon-beta-1a chemotherapy injections three times weekly to treat her condition, as well as nine other medications for her complicated diseases. (Id.) Plaintiff had a left wrist fracture in addition to: blurred vision; fatigue: leg weakness; bladder control difficulty; and cognitive complaints. (Id.) Upon examination, Dr. Apatoff reported Plaintiff had left optic neuropathy and ataxic paraparesis, with reduced vibratory sensation in the feet. (Id.) He opined Plaintiff was completely disabled and unable to work in any capacity as of her Onset Date. (Id.)

On October 10, 2019, Dr. Apatoff completed an assessment of Plaintiff's condition (hereafter, the "2019 Apatoff Assessment"). (R. 425). He reported having begun treating Plaintiff in 1998 due to her multiple sclerosis. (Id.) He listed Plaintiff reporting experiencing the following symptoms: blurred vision; numbness; weakness; difficulties with bladder and bowel control; and, fatigue. (Id.) Dr. Apatoff further noted Plaintiff had limited activity due to her fatigue and vision issues, in addition to unsteady gait, vertigo, and dizziness. (R. 427). His clinical findings regarding Plaintiff included difficulty ambulating, neuropathy, unsteady gait, and fatigue. (Id.) Dr. Apatoff recommended quarterly follow-ups, with telephone conferences in between, if necessary. (R. 426). Dr. Apatoff opined Plaintiff could sit, stand, or walk one hour within a workday, in

addition to lifting up to 10 pounds for one hour within the workday. (Id.) He indicated Plaintiff could operate a motor vehicle. (Id.) However, Plaintiff could not: climb; twist; bend; reach above shoulder level; perform fine finger movements; or perform eye/hand movements during the day. (Id.) Nor could Plaintiff lift anything greater than 10 pounds or push or pull objects at all. (Id.) Dr. Apatoff reported, due to the unpredictability of multiple sclerosis, Plaintiff's treatment plan could vary according her presenting symptoms. (R. 427).

### 2. Raul Mendoza, M.D.

On December 5, 2017, shortly before Plaintiff's Onset Date, Plaintiff saw cardiologist Dr. Raul Mendoza ("Dr. Mendoza"), for a cardiac work-up, stress test, and an echocardiogram. (R. 396). Dr. Mendoza documented Plaintiff's medical history, including: congestive heart failure; coronary artery disease; hypertension; hyperlipidemia; depression; and, multiple sclerosis. (Id.) The Doctor's assessments revealed: atherosclerotic heart disease of the native coronary artery without angina pectoris; the presence of coronary angioplasty implant and graft; old anterior myocardial infarction; and, hyperlipidemia. (R. 397). On April 23, 2018, and November 5, 2018, Plaintiff had follow-up appointments with Dr. Mendoza. (R. 399, 432.) At said appointments, Plaintiff denied: chest pain; chest tightness; fainting; jaw pain; lower extremity swelling; orthopnea;

palpitations; paroxysmal nocturnal dyspnea; syncope; or implantable cardioverter-defibrillator ("ICD") shocks. (R. 399, 432-33.)

On March 11, 2019, Plaintiff returned to Dr. Mendoza because she was suffering a vertigo episode. (R. 435). Upon a cardiovascular examination, Dr. Mendoza reported Plaintiff was: neurologically alert; oriented within normal limits; and, lacking chest tenderness. (R. 436). He began Plaintiff on a treatment of Meclizine, to be taken once daily, as needed. (Id.)

### 3. Brett Lenart, M.D. and Bennett Brown, M.D.

After enduring a wrist injury from a fall, on January 3, 2018, Plaintiff saw orthopedic specialist Brett Lenart, M.D. ("Dr. Lenart"). (R. 363-65.) Dr. Lenart documented Plaintiff suffering: wrist swelling; tenderness over the distal radius; and, pain with wrist motion. (R. 364). An X-ray examination further revealed a fracture. (Id.) The Doctor directed Plaintiff to: use a splint, ice, and Tylenol for pain: and, elevate her wrist. (Id.) On January 5 and 12, 2018, Plaintiff had follow-up examinations with Dr. Bennett Brown ("Dr. Brown"), a physician who practiced with Dr. Lenart. (R. 366-71). She had a third follow-up appointment with Dr. Brown on February 2, at which time Plaintiff reported both her wrists felt better despite increased swelling. (R. 372). On March 2, Plaintiff had a final visit with Dr. Brown, who noted Plaintiff was doing well; he recommended physical therapy and

cleared Plaintiff for light activities to the extent she could tolerate same. (R. 375-77).

### 4. Chantale Vante, M.D.

On June 15, 2018, Plaintiff saw internist Chantale Vante, M.D. ("Dr. Vante"), for a consultative examination. (R. 400-06). Plaintiff relayed she suffered from: multiple sclerosis for about 30 years; coronary artery disease status post ICD implantation; hypertension; hyperlipidemia; depression; and injury to the left forearm. (R. 401). Plaintiff reported her multiple sclerosis was being treated with Rebif injections, 44 mcg three times per week, with no complications. (Id.) She further reported, among other things, having an ICD implantation in 2013 and a stent placement in 2015; relatedly, Plaintiff did not complain of current chest pain or shortness of breath related to coronary artery disease. (R. 401-02.) The Doctor also noted the various medications Plaintiff was then taking, including Cymbalta and Lexapro to treat Plaintiff's depression. (Id.) Dr. Vante also recorded Plaintiff having previously injured her forearm. (Id.)

During the consultative examination with Dr. Vante, Plaintiff described her physical abilities as being able to: sit for two to three hours at a time; stand for two hours; walk one to two city blocks; and, climb one flight of stairs using the handrail. (R. 402). As for her activities of daily living,

Plaintiff stated: once a week, she will cook, clean, launder, and shop; she is able to shower, bathe, and dress herself; she watches television, listens to the radio, reads, and socializes with friends. (Id.)

Upon examination, Dr. Vante observed, inter alia, Plaintiff: had 20/25 corrected vision in both eyes; walked with a normal gait; did not appear to demonstrate any acute distress; had a regular heart rhythm; and had normal results for the examination of her chest and lungs, abdomen, musculoskeletal, neurologic, and extremities. (R. 403-04.). Based on these findings, Dr. Vante opined Plaintiff had a good prognosis with no functional limitations. (R. 404.)

### 5. C. Li, M.D.

On July 2, 2018, an agency medical consultant, C. Li., M.D. ("Dr. Li"), reviewed Plaintiff's information and, without the benefit of examining her, provided an opinion regarding the Plaintiff's physical limitations. (R. 115). Dr. Li reported Plaintiff could: occasionally carry and lift 50 pounds; could frequently carry and lift 25 pounds; and, could stand and sit for about 6 hours during an 8-hour workday. (R. 116.) Hence, according to Dr. Li, Plaintiff was able to engage in sustained sedentary work, i.e., she was not disabled. (R. 118.)

6. Claude-Aline Charles, Psy.D.[3]

On August 23, 2018, Claude-Aline Charles, Psy.D. ("Dr. Charles"), conducted a psychiatric consultative evaluation of the Plaintiff. (R. 414-18). Plaintiff reported leaving employment due to increased challenges with her memory. (R. 414). Plaintiff reported two medical hospitalizations in 2013, one for a heart attack and another to undergo a procedure for a pacemaker and a defibrillator. (Id.) She further reported having irregular sleep due to stress and depressive symptoms such as irritability and fatigue/loss of energy. (R. 415). In addition, Plaintiff stated she had cognitive struggles with short-term memory deficits, concentration difficulties, organizational difficulties, as well as long-term memory deficits. (Id.) Plaintiff stated she was able to dress, bathe, and groom herself, though at a slow pace. (R. 416). Plaintiff was also able to drive, as well as, manage her own finances. (Id.) Plaintiff spent most of her time watching television, doing crossword puzzles, going out to dinner, and using a laptop. (Id.)

---

[3] The acronym "Psy.D." stands for Doctor of Psychology. See LIU Post: Psy.D vs Ph.D, available at https://liu.edu/post/academics/school-of-health-professions/programs/doctor-of-psychology/psyd-vs-phd (last viewed Dec. 2, 2024). It is "similar to the Ph.D. (Doctor of Philosophy) and the Ed.D. (Doctor of Education) in academic standing" but with a greater focus on clinical training. Id.

Plaintiff denied any history of psychiatric hospitalizations, has never been enrolled in any mental health services, and was been prescribed Cymbalta and Lexapro by her neurologist. (R. 414). The Doctor listed other medication Plaintiff was taking, but was unable to provide dosages since Plaintiff failed to bring that information to the examination. (Id.)

Dr. Charles found Plaintiff cooperative during the interview with adequate social skills. (R. 415). The Doctor documented Plaintiff as presenting: a normal appearance; fluent speech; coherent thought process; and, a neutral mood. (Id.) Plaintiff's attention and concentration were mildly impaired, but she was able to count and perform simple calculations. (Id.) Plaintiff's "[m]emory skills were fairly intact." (Id.) Her intellectual functioning appeared to be average to above average, with her general fund of information being appropriate to her experience. (Id.) Dr. Charles noted Plaintiff's insight and judgment were good. (Id.)

Dr. Charles opined Plaintiff had no limitations in the following: understanding, remembering, or applying simple directions and instructions; using reason and judgment to make work-related decisions; interacting adequately with supervisors, coworkers, and the public; regulating emotions; controlling behavior; and, maintaining her well-being. (R. 417). However,

Plaintiff had mild limitations in the following: sustaining concentration; performing tasks at a consistent pace; maintaining personal hygiene; having appropriate attire; and, being aware of normal hazards and taking appropriate precautions. (Id.) Dr. Charles concluded Plaintiff had mild to moderate limitations in understanding, remembering, or applying complex directions and instructions, which limitations were attributed to distractibility and anxiety. (Id.) Based on her findings, Dr. Charles opined Plaintiff's psychiatric problems did not appear to be significant enough to interfere with her ability to function on a daily basis. (Id.)

### 7. Kristen Gawley, Ph.D.

On September 4, 2018, Kristen Gawley, Ph.D. ("Dr. Gawley"), an agency psychological consultant who did not personally examine Plaintiff, reviewed Plaintiff's claim and provided a medical opinion. (R. 113-114). Dr. Gawley confirmed the evidence and reported Plaintiff had a history of depression and used medications Cymbalta and Lexapro as treatment. (R. 114). Plaintiff's cardiology note indicated PMH of depression. (Id.) Dr. Gawley agreed with Dr. Charles' psychiatric consultative evaluation thatPlaintiff would have some mild limitations in understanding, remembering, applying information, concentrating, persisting, and maintaining pace. (Id.) The Doctor further agreed Plaintiff had no limitation in interacting with others or

adapting/managing herself. (Id.)  She concluded the limitations were not significant enough to interfere with functioning. (Id.) Further, Dr. Gawley opined Plaintiff appeared able to: follow supervision; relate appropriately with others; and respond appropriately to changes in the workplace. (Id.)

        8.   <u>Emergency Department Personnel: Mathew Lurin M.D.; Amrinder Rane, PA; Geraldine Abbey-Mensah, M.D.; and Raul Mendoza, M.D.</u>

On March 8, 2019, Plaintiff presented at an emergency department, complaining of dizziness associated with intermittent blurry vision. (R. 472). Upon a physical examination, Plaintiff: was found to be well; had no lymph node enlargement; had clear pupils, normal cardiac rate, unlimited range of motion; and, did not have muscle or joint tenderness. (R. 474). She was alert; her gait, posture, and coordination were normal. (Id.) A CT-scan was performed; Plaintiff's results indicated she had small vessel disease as evidenced by her periventricular and subcortical white matter hypodensity. (R. 477). A chest X-ray showed no evidence of acute pulmonary disease. (R. 478). Plaintiff's electrocardiogram ("ECG") exhibited normal sinus rhythm, with low voltage QRS, but did not rule out anterior infarct; the ECG was deemed abnormal. (R. 480). Plaintiff was diagnosed with a urinary tract infection. (R. 478.) Her dizziness was treated with Meclizine, which alleviated same. (Id.) Plaintiff was discharged in a stable

condition; she stated she would follow up with her neurologist and primary care provider. (Id.)

### 9. Lawrence Kanner, M.D.

On May 28, 2019, Plaintiff presented for a routine device follow-up of her implanted defibrillator with Lawrence Kanner, M.D. ("Dr. Kanner"). (R. 439-40.) At that time, Plaintiff did not have any device-related complaints. (R. 439). Dr. Kanner documented Plaintiff felt generally well with normal findings; he advised her to continue remote monitoring and to have a routine device follow-up in six months. (R. 440).

### C. The VE's Testimony

At the 2020 Disability Hearing, the VE testified Plaintiff had worked as a hospital insurance representative and a controller, both of which required sedentary exertion. (R. 102). When presented with a hypothetical aligning with Plaintiff's vocational profile and residual functional capacity ("RFC"), the VE testified said hypothetical individual would be able to perform Plaintiff's past work. (R. 104). However, when the ALJ presented the additional scenario that the subject hypothetical individual would be on-task only 80 percent of the day and be absent three days a month, all past work would be eliminated. (R. 104-05). Plaintiff's counsel also inquired whether not being able to perform complex task would inhibit engaging in prior work, to which the VE testified such restriction would eliminate prior work. (R. 105.)

III. <u>Purported "New Evidence" Presented to the Appeals Council</u>

   Plaintiff submitted additional evidence to the Appeals Council after issuance of the ALJ Decision. (R. 34-76). It consisted of records from Plaintiff's neurologist, Dr. Brian Apatoff. (R. 34-52). Included in the new submissions was the record of an 1988 MRI performed on Plaintiff's thoracic spine, which revealed multiple elongated hyperintense intra-medullary lesions from T6 through T10. (R. 36). There was also a record of a June 2000 cranial MRI examination, which showed Plaintiff had scattered hyperintensities in the white matter of the cerebral hemispheres bilaterally. (R. 37). Further, the newly offered evidence included handwritten treatment records from: November 1, 2017; February 5, 2018; April 30, 2018; May 30, 2018; October 24, 2018; June 27, 2019; October 10, 2019; and February 12, 2020. (R. 44-52). While partially illegible, Dr. Apatoff's records appear to include Plaintiff's repeated complaints of: stress; fatigue; constipation; limited activity; chronic pain; depression; cognitive dysfunction; and, weakness. (<u>Id.</u>)

   Additionally, Dr. Apatoff prepared a statement of disability on Plaintiff's behalf, dated April 23, 2020 (hereafter, the "2020 Statement"). (R. 34-35). In his 2020 Statement, Dr. Apatoff explained: he had been treating Plaintiff since 1985 when she presented with optic neuritis of the left eye involving complete loss of vision; and, Plaintiff has experienced subsequent

relapsing numbness, pain, and weakness of the arms and legs. (R. 34). The Doctor further reported MRIs performed on Plaintiff showed multiple lesions indicative of multiple sclerosis, which diagnosis was confirmed by a lumbar puncture. (Id.) Dr. Apatoff stated that, for the prior 22 years, Plaintiff has been seen every four-to-six for relapsing remitting multiple sclerosis. (Id.) Moreover, Plaintiff was on thrice-weekly injections of interferon-beta chemotherapy, but severe attacks of symptoms required one-to-three days of high-dose IV Solumedrol corticosteroids. (Id.) Dr. Apatoff reported four major multiple sclerosis relapses resulted in Plaintiff's long-term absences from work: in 2004; in 2006; in 2011; and, in 2017. (Id.) He also stated that in 2013, Plaintiff was diagnosed with severe heart disease, "another significant medical comorbidity". (Id.) The Doctor opined, despite "active ongoing treatment", Plaintiff experienced progressive disability with: visual loss; leg weakness with gait impairment; numbness and pain in the extremities; impaired bladder control; depression; and pathologic fatigue with cognitive impairment despite the ongoing treatment. (R. 35.) He concluded, based upon his being a "Board-Certified Neurologist specializing in multiple sclerosis" that, having suffered from multiple sclerosis for 35 years, Plaintiff "experienced progressive disability" "prevent[ing] her from working in any capacity" since her Onset Date. (Id.)

DISCUSSION

I.    Standard of Review

When reviewing a final decision from the Commissioner, a district court must "conduct a plenary review of the administrative record to determine if there is substantial evidence, considering the record as a whole, to support the Commissioner's decision and if the correct legal standards have been applied." Rucker v. Kijakazi, 48 F.4th 86, 90–91 (2d Cir. 2022) (quoting Estrella v. Berryhill, 925 F.3d 90, 95 (2d Cir. 2019)).  District courts will overturn an ALJ's decision only if the ALJ applied an incorrect legal standard, or if the ALJ's ruling was not supported by substantial evidence.  Id. (citing Talavera v. Astrue, 697 F.3d 145, 151 (2d Cir. 2012)).  "[S]ubstantial evidence . . . means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Selian v. Astrue, 708 F.3d 409, 417 (2d Cir. 2013) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971));  see also Del Priore v. Comm'r of Soc. Sec., No. 17-CV-5709, 2019 WL 4415279, at *2 (E.D.N.Y. Sept. 16, 2019) (same; quoting Moran v. Astrue, 569 F.3d 108, 112 (2d Cir. 2009)).

[Remainder of page intentionally left blank.]

II.  <u>The ALJ's Decision and the Five-Step Disability Analysis</u>[4]

        Initially, the ALJ found Plaintiff met the insured status requirement through December 31, 2020. (R. 18).  The ALJ then applied the five-step disability analysis and concluded Plaintiff was not disabled from her Onset Date through March 30, 2020, the date of the ALJ Decision. (R. 19-29); <u>see also</u> 20 C.F.R. § 404.1520.

        At <u>step one</u>, the ALJ found Plaintiff had not engaged in substantial gainful activity since her alleged Onset Date. (R. 20).

        At <u>step two</u>, the ALJ determined Plaintiff had the following severe impairments: multiple sclerosis and a myocardial infarction with congestive heart failure/defibrillator insertion. (R. 21).  The ALJ concluded Plaintiff's hypertension, right wrist fracture, and mental impairment of an adjustment disorder were non-severe[5] because they did not result in more than minimal work-related physical/exertional limitations.  (<u>Id.</u>)

---

[4]  As will be discussed <u>infra</u>, because it focuses its analysis upon whether the ALJ fully and fairly developed the record below (Plaintiff's first of five arguments in support of remand), the Court's discuss of the ALJ Decision is similarly focused.  Thus, herein, not all of the ALJ Decision is summarized.

[5]  In making his finding regarding Plaintiff's mental impairment, the ALJ considered the broad functional areas of mental functioning set out in the disability regulations for evaluating mental disorders, <u>i.e.</u>, the "paragraph B" criteria.  (R. 21; <u>see also</u> R. 22-23.)  For the first functional area (understanding, remembering, or applying information), Plaintiff was found to have

At <u>step three</u>, the ALJ concluded Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the Appendix 1 listed impairments. (R. 23.)  The required level of severity for the impairment of chronic heart failure is met when the requirements in both Part A and Part B of Appendix 1 are met, but Plaintiff met only the requirements of Part A.  (R. 23-24.)

At <u>step four</u>, the ALJ determined Plaintiff had the RFC to "perform light work but with the following non-exertional limitations: the claimant can occasionally stoop, crouch, crawl, kneel and climb; frequently balance, and she can perform simple and complex tasks and no work in extreme heat or around unprotected heights or machines with moving parts."  (R. 24.)  The ALJ purportedly considered all symptoms (to the extent those symptoms were reasonably consistent with the objective medical evidence), medical opinions and prior administrative medical findings. (<u>Id.</u>)

---

a mild limitation.  (R.22.)  For the second functional area (interacting with others), Plaintiff was found to have no limitation. (<u>Id.</u>)  For the third functional area (concentrating, persisting or maintaining pace), Plaintiff was found to have a mild limitation.  (R. 22-23.)  For the fourth functional area (adapting or managing oneself), Plaintiff was found to have no limitation.  (R. 23).  Hence, with Plaintiff's medically determinable mental impairment causing no more than mild limitation in any of the functional areas, the ALJ concluded Plaintiff's mental impairment was non-severe.  (R. 23.)  His finding of a non-severe mental impairment was based upon the opinions of Dr. Charles (a consultative psychologist) and Dr. Gawley (a non-examining consultative psychologist).  (R. 27.)

In considering Plaintiff's symptoms, the ALJ followed a two-step process: at step one, determining whether there was an underlying medically determinable physical or mental impairment which could reasonably be expected to produce Plaintiff's pain or other symptoms; and, at step two, evaluating the intensity, persistence, and limiting effects of Plaintiff's symptoms to determine the extent to which they limited her work-related activities. (Id.)

At the Disability Hearing, Plaintiff testified: she left her employment in December of 2017 due to complications from multiple sclerosis exacerbations and a heart attack; her multiple sclerosis exacerbations ranged from one day to four-to-four week periods; and, she had other health complications, e.g., Grave's disease, carpal tunnel syndrome, leg pain, blurred vision, migraine headaches, bowel problems, and short-term memory loss. (R. 24.)

While the ALJ found Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms, he also found Plaintiff's statements concerning the intensity, persistence and limiting effects of her symptoms were not entirely consistent with the medical evidence. (R. 25).  The ALJ based his conclusion upon his review of Plaintiff's medical

records from: Dr. Mendoza;[6] Dr. Apatoff; Dr. Brown;[7] and, South Nassau Communities Hospital.[8] (Id.)  Of relevance:  Dr. Apatoff's records indicated Plaintiff, who was treating Plaintiff for multiple sclerosis, had active symptoms, e.g., blurred vision, fatigue, leg weakness and numbness, bladder control difficulties, and cognitive complaints. (Id.)

Further, the ALJ found the opinion of Dr. Vante "somewhat persuasive" because it was consistent with opinion of Dr. Li, as well as the objective medical findings in the record.  (R. 26.) Dr. Vante's opinion was based upon a consultative internal medical examination that led to impressions of: multiple sclerosis; coronary artery disease; status post-implantable cardioverter defibrillator; hypertension; hyperlipemia; depression; and, a history of left forearm injury. (Id.) Dr. Vante found Plaintiff's physical examination unremarkable and that she had no limitations. (Id.)  Non-examining medical consultant Dr. Li assessed Plaintiff could perform medium work with no postural, manipulative, visual, communicative or environmental limitations.  (Id.)  The ALJ found

---

[6]  Dr. Mendoza's records indicated Plaintiff denied chest pain, dizziness, shortness of breath, palpitations and fatigue during a chest examination.  (R. 25.)

[7]  Dr. Brown's records indicated Plaintiff was doing well post-fracture, was not on pain medication, and had no work status restrictions.  (R. 25.)

[8]  Records from South Nassau Communities indicated Plaintiff presented with dizziness which resolved with medication. (R. 25.).

Dr. Li's opinion "persuasive" because it was consistent with Dr. Vante's opinion and "the objective medical findings of record." (Id.)

Conversely, the ALJ found Dr. Apatoff's opinion unpersuasive because: (1) it was inconsistent with the opinions of Dr. Vante and Dr. Li; and (2) the extreme limitations described by Dr. Apatoff in his 2019 Assessment were purportedly not supported or consistent with the physical examination findings reported by him during Plaintiff's prior, April 2018 visit. (Id.)  In his 2019 Assessment, Dr. Apatoff opined Plaintiff was able to sit, stand and walk a total of one hour each in an eight-hour workday, in addition to having extreme limitations in movement.  The ALJ found "[t]hat opinion is not persuasive as the extreme limitations described by the doctor are not supported or consistent with the physical examination findings reported by him on an examination on April 30, 2018 and only complaints of extreme fatigue, balance problems, vision issues, bladder and bowel difficulties and unsteady gait--without any physical examination findings to support them--were reported by Dr. Apatoff in his [2019 A]ssessment."  (R. 26.)  The ALJ also observed Dr. Apatoff's dissatisfaction with the assessment chart as a means of reporting on Plaintiff's condition given the unpredictability of multiple sclerosis.  (Id.)  Finally, the ALJ noted "there are no records of

any treatment or examination findings by Dr. Apatoff between his [2018 Statement] and his [2019 A]ssessment." (R. 27.)

The ALJ also found Dr. Mendoza's opinion to be unpersuasive, but because of conflicts within his opinions. (R. 27). During one examination, Dr. Mendoza stated Plaintiff could not perform work-related activities; at another examination, the Doctor was unable to provide an opinion regarding the Plaintiff's ability to perform work-related activities. (Id.)  Further, Dr. Mendoza opined Plaintiff could stand or walk only two hours in a workday, which was contradicted by Drs. Vante and Li. (Id.)  In sum:  The ALJ's determination of the Plaintiff's RFC for light work was supported by the opinion of Drs. Vante and Li. (R. 27.)

At step five, the ALJ concluded the Plaintiff was capable of performing past relevant work as a hospital insurance representative and as a controller. (R. 28).  He opined that such work did not require the performance of work relative activities precluded by Plaintiff's RFC.  (Id.)  Accordingly, the ALJ determined the Plaintiff was not disabled.  (Id.)

III. Analysis

A.    The Parties' Positions

Plaintiff advances several arguments: (1) the ALJ failed to fully and fairly develop the record (Pl. Br. 15); (2) the Appeals Council failed to find reasonable probability that Dr. Apatoff's records would change the outcome of the ALJ Decision;

(3) the ALJ failed to properly consider Plaintiff's optic neuropathy; (4) the ALJ failed to properly evaluate Plaintiff's mental impairment; and, (5) the ALJ Decision is not supported by substantial evidence and is based upon erroneous legal standards. (See generally Pl. Support Memo.) Unsurprisingly, the Commissioner contends otherwise. (See generally Comm'r Support Memo.) The Court focuses it analysis primarily upon Plaintiff's first argument in making its ruling.

    B.   Relevant Law

       It is well-established:

> Social Security proceedings are non-adversarial and the ALJ is obliged "to investigate the facts and develop the arguments both for and against granting benefits." Sims v. Apfel, 530 U.S. 103, 111, 120 S. Ct. 2080, 147 L. Ed. 2d 80 (2000) (citation omitted). This obligation applies even if the claimant is represented by counsel. See, e.g., Rosa v. Callahan, 168 F.3d 72, 79 (2d Cir. 1999) (citing Perez v. Chater, 77 F.3d 41, 47 (2d Cir. 1996)). The ALJ's duty to develop the record has been described as a "bedrock principle of Social Security law." Batista v. Barnhart, 326 F. Supp. 2d 345, 353 (E.D.N.Y. 2004) (citing Brown v. Apfel, 174 F.3d 59 (2d Cir. 1999)).

Michelle C. v. Comm'r of Soc. Sec., No. 23-CV-7144, 2024 WL 1706000, at *5 (S.D.N.Y. Apr. 3, 2024), report and recommendation adopted, 2024 WL 1702127 (S.D.N.Y. Apr. 18, 2024).

      "Whether the ALJ has satisfied this duty to develop the record is a threshold question. Before determining whether the

Commissioner's final decision is supported by substantial evidence
. . . the court must first be satisfied that the ALJ . . .
completely developed the administrative record." Campbell v.
Comm'r of Soc. Sec., No. 19-CV-4516, 2020 WL 4581776, at *14
(S.D.N.Y. Aug. 10, 2020); see also Telesco v. Comm'r of Soc. Sec.,
577 F. Supp. 3d 336, 353 (S.D.N.Y. 2021) (finding, even though
claimant did not challenge sufficiency of the record, ALJ erred by
failing to adequately develop the record); Berte v. Comm'r of Soc.
Sec., No. 20-CV-2889, 2023 WL 2760515, *3 (E.D.N.Y. Apr. 3, 2023)
(remanding case where ALJ based his non-disability determination
on deficiencies in claimant's medical records because ALJ failed
to develop said record) (collecting cases); Sanchez v. Saul,
No. 18-CV-12102, 2020 WL 2951884, at *23 (S.D.N.Y. Jan. 13,
2020) ("As a threshold matter, and regardless of the fact that
Plaintiff did not raise an express challenge to the adequacy of
the Record, this Court must independently consider the question of
whether the ALJ failed to satisfy his duty to develop the
Record."), report and recommendation adopted, 2020 WL 1330215
(S.D.N.Y. Mar. 23, 2020). "Failing to adequately develop the
record is an independent ground for vacating the ALJ's decision
and remanding for further findings." Diano v. Comm'r of Soc. Sec.,
No. 19-CV-2265, 2020 WL 13555076, at *16 (citing Rosa v. Callahan,
168 F.3d 72, 83 (2d Cir. 1999) (finding remand "particularly
appropriate" where ALJ failed to obtain adequate information from

treating physicians and potentially relevant information from other doctors)) (collecting cases).

Additionally,

[f]or claims filed on or after March 27, 2017, [like here,] the ALJ "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from your medical sources." 20 C.F.R. §§ 404.1520c(a), 416.920c(a). Instead, the ALJ will evaluate the persuasiveness of medical opinions and prior administrative medical findings using the following factors: (1) supportability, (2) consistency, (3) relationship with the claimant, (4) specialization, and (5) other factors that tend to support or contradict a medical opinion or prior administrative medical finding. See id. §§ 404.1520c(c), 416.920c(c). Of those, the "factors of supportability . . . and consistency . . . are the most important factors." Id. §§ 404.1520c(b)(2), 416.920c(b)(2); see also Loucks v. Kijakazi, No. 21-1749, 2022 WL 2189293, at *1 (2d Cir. June 17, 2022).

An ALJ is specifically required to "explain how [he or she] considered the supportability and consistency factors" for a medical opinion. 20 C.F.R. §§ 404.1520c (b)(2), 416.920c(b)(2). With respect to supportability, "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." Id. §§ 404.1520c(c)(1), 416.920c(c)(1). With respect to consistency, "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical

> finding(s) will be." Id. §§ 404.1520c(c)(2),
> 416.920c(c)(2).

Lena Nicole H. v. Comm'r of Soc. Sec., No. 23-CV-0826, 2024 WL 4133819, at *5 (N.D.N.Y. July 30, 2024); see also, e.g., Michelle C. v. Comm'r of Soc. Sec., 2024 WL 1706000, at *5. The most relevant factors in determining the persuasiveness of medical findings are the supportability and consistency factors. See Acheampong v. Comm'r of Soc. Sec., 564 F. Supp. 3d 261, 266 (E.D.N.Y. 2021); see also Navedo v. Kajakazi, 616 F. Supp. 3d 332, 343 (N.D.N.Y. 2022) ("Under the new regulations, the ALJ must 'explain how he considered' both the supportability and consistency factors, as they are 'the most important factors.'" (quoting 20 C.F.R. §§ 404.1520c(b)(2), 416.1520c(b)(2) (emphasis added); further citation omitted); Keli Ann D. v. Comm'r of Soc. Sec., No. 23-CV-0765, 2024 WL 3493274, at *5 (N.D.N.Y. July 22, 2024) ("The revised regulations for evaluating opinion evidence place substantial emphasis on both supportability and consistency and require the ALJ to explain the analysis of each of those factors." (emphasis added)). The failure to properly consider and apply the supportability and consistency factors are grounds for remand. See Schonfeld v. Comm'r of Soc. Sec., No. 21-CV-6053, 2023 WL 2625833, at *13 (S.D.N.Y Mar. 24, 2023); Navedo, 616 F. Supp. 3d at 344 (same; collecting cases).

While the treating physician rule is no longer in effect, courts in this district have held the factors under the new regulations "are very similar to the analysis under the old treating physician rule." Velasquez v. Kijakazi, No. 19-CV-9303, 2021 WL 4392986, at *20 (S.D.N.Y. Sept. 24, 2021) (collecting cases); Navedo, 616 F. Supp. 3d at 344 (same; quoting Velasquez); Cuevas v. Comm'r of Soc. Sec., No. 20-CV-0502, 2021 WL 363682, at *9 (S.D.N.Y. Jan. 29, 2021) ("[T]he essence of the rule remains the same, and the factors to be considered in weighing the various medical opinions in a given claimant's medical history are substantially similar."). For example, when an ALJ considers the medical source's relationship with the claimant, the ALJ must consider: the length of the treating relationship; the frequency of examinations; the purpose of the treatment relationship; the extent of the treatment relationship; and the examining relationship. See 20 C.F.R. § 1520c(c)(3)(i)-(v).

C.    Issues with the Record Below Warranting Remand

As an initial matter, it is important to properly frame Plaintiff's claim: "Ms. Kelly testified that she stopped working due to an exacerbation of her multiple sclerosis ([R]. 81). She did not testify that she stopped working due to cardiac issues, wrist issues, or dizziness ([R]. 91)." (Reply at 5.) This fact is key to the Court's analysis and review of the ALJ's

consideration of the opinion of Dr. Apatoff, Plaintiff's treating neurologist.

In asserting the ALJ failed to fully develop the record (see Pl. Support Memo at 15), Plaintiff highlights the ALJ's determination that the opinion of Dr. Apatoff was unpersuasive, with the ALJ explaining, inter alia: "[T]here are no records of any treatment or examination findings by Dr. Apatoff between his [2018 Statement] and his [2019 A]ssessment." (R. 27 (citing Exs. 16F & 15F, respectively[9]).) Notwithstanding the ALJ underscoring this perceived problem (see, e.g., R. 26), Plaintiff contends the ALJ made no attempt to develop the record to address the apparent gap in the medical record. (See Pl. Support Memo at 15 ("It was entirely inappropriate for the ALJ to decide [Plaintiff]'s case for disability benefits caused by her multiple sclerosis without attempting to obtain and review records from [her] treating neurologist.").) Rather, the ALJ evaluated Plaintiff's claim based upon "a one-page narrative and a three-page medical source statement from Dr. Apatoff regarding her multiple sclerosis", which "two reports certainly cannot be considered 'substantial'." (Reply at 6 (citing R. 425-28).) Moreover, Plaintiff underscores the ALJ did so "without attempting to obtain any treatment notes,

---

[9]  Exhibit No. 16F, the 2018 Statement, is found at R. 428 in the Administrative Transcript; Exhibit 15F, the 2019 Assessment, is found at R. 42-27 in the Administrative Transcript.

MRIs, or other objective tests from" Dr. Apatoff, "the provider treating [Plaintiff's] main disabling condition, even though the ALJ knew these records were missing." (Id.) Plaintiff's position is persuasive.

While it is true a claimant must "make every effort to ensure that the [ALJ] receives all of the evidence," 20 C.F.R. §§404.935(a), 416.1435(a), it is equally true that where, as here, there is an obvious gap in the medical evidence, the ALJ is obligated to take steps to fill said gap. See Rosa, 168 F.3d at 79 ("[A]n ALJ cannot reject a treating physician's diagnosis without first attempting to fill any clear gaps in the administrative record." (citations omitted)).

The ALJ's unchallenging reliance upon Plaintiff's counsel's representation at the Disability Hearing regarding the production of medical records (see R. 80), upon which the Commissioner relies (see Comm'r Support Memo at 14), is unavailing in this instance. See, e.g., Rosa, 168 F.3d at 79-80 (holding, where there were numerous gaps in the administrative record "that should have prompted the ALJ to pursue additional information regarding [claimant's] medical history", ALJ "should have taken steps" to have medical source supplement its findings). The ALJ's own comparison of Dr. Apatoff's 2018 Statement to his 2019 Assessment showcased the obvious gaps in the medical records. (See R. 26-27; see also supra at 24-25.) Moreover, by its very content,

at a minimum, the 2018 Statement should have put the ALJ on notice Dr. Apatoff was Plaintiff's neurologist, who had been treating Plaintiff for multiple sclerosis, pursuant to a doctor-patient relationship, for a period of time (i.e., not on a one-time consultative basis).  (R. 428.)  Indeed, in said Statement, Dr. Apatoff stated Plaintiff: was under his care "for multiple sclerosis, a neurological disorder with progressive disability"; had "her latest assessment [] today[, i.e., April 30, 2018,] in the office"; "has active symptoms"; and, has "complicating medical comorbidities".  (Id. (emphasis added).)  The 2018 Statement clearly signaled Dr. Apatoff had additional medical records that would be relevant to his medical opinion that Plaintiff was "unable to work in any capacity" since her Onset Date.  (Id.)  Moreover, given, in his 2019 Assessment: (1) Dr. Apatoff reported Plaintiff's plan of treatment included quarterly follow-up appointments, with intervening telephone conferences if necessary; and, (2) said Assessment was made approximately one-and-a-half years after the 2018 Statement, simple math indicated four-to-six visits would likely have occurred and, presumably, generated medical records for consideration.  Yet, the ALJ made no such inquiry as to the existence or availability of such records; instead, he assumed there were "no records of any treatment or examination findings" between the 2018 Statement and the 2019 Assessment.  (R. 27.) "[T]he Court finds that the absence of these records created

'obvious gaps' in the administrative record, and the ALJ failed to fulfill his affirmative duty to close these gaps. '[W]here there are gaps in the administrative record, remand to the Commissioner for further development of the evidence is in order.'" Martinez v. Saul, No. 3:19-CV-1017, 2020 WL 6440950, at *4 (D. Conn. Nov. 3, 2020) (citing Rosa, 168 F.3d at 83; further citation omitted).

Relatedly, the Court finds persuasive Plaintiff's argument that, since "Dr. Li only reviewed cardiology and orthopedic records before giving an opinion", and "did not review Dr. Apatoff's medical source statement or narrative", " Dr. Li's report is also insufficient." (Reply at 6 (citing R. 114-117).) The Court concurs. See, e.g., Martinez, 2020 WL 6440950, at *8. Moreover, in addition to being based upon an incomplete medical record, because Dr. Li's report was from early July 2018, it is also stale. "[M]edical source opinions that are conclusory, stale, and based on an incomplete medical record may not be substantial evidence to support an ALJ finding." Id. (quoting Camille v. Colvin, 104 F. Supp. 3d 329, 343 (W.D.N.Y. 2015) (citation and internal quotation marks omitted), aff'd, 652 F. App'x 25 (2d Cir. 2016) (summary order); further citation omitted).

Similarly, Plaintiff contends Dr. Vante's report, based upon a one-time examination in mid-June 2018, "is entirely inadequate." (Reply at 6.) Again, the Court agrees. As Plaintiff asserts, "Dr. Vante wrote in her report that [Plaintiff] had 'no

complications from her multiple sclerosis' and opined that she had no physical limitations", which contradicts Dr. Apatoff's 2018 Statement and 2019 Assessment. (Id. (citing R. 401, 404).)  Like the Li report, compared to the 2019 Assessment, Dr. Vante's 2018 report is stale.  Moreover, at most, it provides no more than a one-time snapshot of Plaintiff's health; it failed to provide a longitudinal picture of Plaintiff's health and limitations.  For this reason the Circuit Court has long cautioned:  "ALJs should not rely heavily on the findings of consultative physicians after a single examination."  Selian v. Astrue, 708 F.3d 409, 419 (2d Cir. 2013); see also Cruz v. Sullivan, 912 F.2d 8, 18 (2d Cir. 1990) ("[C]onsultative exams are often brief, are generally performed without benefit or review of claimant's medical history and, at best, only give a glimpse of the claimant on a single day.  Often, consultative reports ignore or give only passing consideration to subjective symptoms without stated reasons."); Fintz v. Kijakazi, No. 22-CV-0337, 2023 WL 2974132, at *4-5 (E.D.N.Y. Apr. 15, 2023) (finding deficient ALJ's reliance on single report of consulting physician who examined claimant once, especially since courts frequently caution ALJs against such heavy reliance of same).  In any event, upon the record presented, it is wholly unclear why the ALJ found Dr. Vante's opinion somewhat persuasive when compared to Dr. Li's non-examination-based report issued two weeks after Dr. Vante's report.  Rather, the ALJ's

reliance on Li's report to find Vante's report "somewhat persuasive" is somewhat circular in reasoning.

Finally, the Court observes, as to the ALJ's apparent discounting of Dr. Apatoff's 2019 Assessment because the Doctor expressed frustration with its means of adequately reporting Plaintiff's limitation given the unpredictable nature of multiple sclerosis, e.g., relapses and remission: "Several district courts in this Circuit have remarked that a treating physician's failure to include a function-by-function analysis in reaching a medical opinion is 'not a good reason for discounting' that opinion." Patrick B. v. Comm'r of Soc. Sec., No. 3:19-CV-1697, 2021 WL 1100177, at *16 (D. Conn. Mar. 23, 2021) (citing Parker v. Comm'r of Soc. Sec. Admin., No. 18-CV-3814, 2019 WL 4386050, at *8 (S.D.N.Y. Sept. 13, 2019); Moreau v. Berryhill, No. 3:17-CV-0396, 2018 WL 1316197, at *11–13 (D. Conn. Mar. 14, 2018); Mondschein v. Saul, No. 3:19-CV-1019, 2020 WL 4364058, at *8 (D. Conn. July 30, 2020)). "Instead, an ALJ might ask that treating physician to supplement the record with a more specific opinion." Id.; see also generally Daniela B. v. Kijakazi, 675 F. Supp. 3d 305, 316 (E.D.N.Y. May 30, 2023) (explaining ALJ has an "affirmative duty to recontact a medical expert if an ALJ makes an initial determination that a medical expert's opinions are vague or appear to be inconsistent with their examination notes").

*** *

"Finding remand necessary for the reasons explained above, the Court need not and does not reach Plaintiff's remaining argument[s] . . . ." Rowe v. Berryhill, No. 17-CV-0208, 2018 WL 4233702, at *5 (W.D.N.Y. Sept. 6, 2018); see also Keli Ann D. v. Comm'r of Soc. Sec., No. 23-CV-0765, 2024 WL 3493274, at *7 (N.D.N.Y. July 22, 2024) (same; quoting Rowe); Poceous v. Comm'r of Soc. Sec., No. 20-CV-4870, 2024 WL 3029197, at *15 n.13 (E.D.N.Y. June 17, 2024) (declining to consider plaintiff's further arguments in support of remand upon finding procedural error by ALJ warranting remand). Those arguments include Plaintiff's claims the ALJ: (1) did not properly evaluate her optic neuropathy; (2) did not properly evaluate her mental impairments; and (3) failed to consider her mental impairments in his RFC determination. For clarity: Upon remand, Plaintiff may advance these arguments and present evidence supporting her claims. See, e.g., Evelyn C.R. v. Kajakazi, No. 3:22-CV-1288, 2023 WL 9022641, at * 9 (D. Conn. Dec. 31, 2023) (remanding entire case to ALJ for new hearing where district court sustained one of claimant's claimed errors, but did not consider other claimed errors, instructing ALJ to conduct "a new evaluation of the evidence, which may alter the current administrative decision" (internal quotation marks and citations omitted)) (collecting cases).

<u>CONCLUSION</u>

Accordingly, **IT IS HEREBY ORDERED** that Plaintiff's Motion (ECF No. 11) is GRANTED, and the Commissioner's Cross-Motion (ECF No. 13) is DENIED.  This matter is REMANDED for proceedings consistent with this Memorandum and Order.

**IT IS FURTHER ORDERED** that the Clerk of the Court enter judgment accordingly and, thereafter, mark this case CLOSED.

**SO ORDERED.**

/s/ JOANNA SEYBERT
Joanna Seybert, U.S.D.J.

Dated:    December 16, 2024
          Central Islip, New York